**In re A. ANGELLE, INC., d/b/a Lakeside Honda, Debtor.**

**American Honda Finance Corporation, Plaintiff,**

**v.**

**A. Angelle, Inc., d/b/a Lakeside Honda, Calcasieu Marine National Bank of Lake Charles, Walter Umphrey, Jeff Branick, and The Calcasieu Parish School Board, Defendants.**

Bankruptcy No. 96–20205.
Adversary No. 96–2011.

United States Bankruptcy Court,
W.D. Louisiana,
Lake Charles Division.

Jan. 12, 1998.

Scott J. Scofield, Lake Charles, LA, for American Honda Finance Corporation.

A.J. Gray, III, Lake Charles, LA, David F. Waguespack, New Orleans, LA, Patrick J. Johnson, Jr., New Orleans, LA, for Hibernia National Bank.

Wade N. Kelly, Lake Charles, LA, for Rudy O. Young, Trustee.

Glenn H. Steele, Jr., Beaumont, TX, for Walter Umphrey and Jeff Branick.

Stephen C. Polito, Lake Charles, LA, for Calcasieu Parish School Board.

## REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

A. Angelle, Inc., d/b/a Lakeside Honda ("Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code[1] on March 7, 1996 ("Petition Date"), and on that day an order for relief was duly entered. The Debtor remained in possession as no chapter 11 trustee was appointed. On July 15, 1996, the case was converted to a case under chapter 7. Rudy O. Young ("Trustee") is the duly appointed, qualified and acting chapter 7 trustee.

This adversary proceeding was instituted by American Honda Finance Corporation ("AHFC") against the Debtor, Hibernia National Bank (successor by merger to Calcasieu Marine National Bank of Lake Charles) ("Hibernia"), Walter Umphrey ("Umphrey"), Jeff Branick ("Branick"), and the Calcasieu Parish School Board ("School Board")[2], to determine the extent, validity and rank of multiple security interests held by AHFC

---

1. Title 11, United States Code. Further references to the Bankruptcy Code herein shall be shown as "section ____."

2. The School Board answered the complaint, stated that it was not a secured creditor and asked to be dismissed from the adversary proceeding.

and the defendants. These security interests encumber virtually all of the Debtor's assets.

AHFC contends that its lien position on such assets is senior to all other claimants. Hibernia claims a first lien position in the Debtor's new and used vehicle inventory as well as the proceeds resulting from the sale of such vehicles. Hibernia also asserts a counterclaim against AHFC to recover $1.2 million which Hibernia paid to AHFC.

Umphrey and Branick admit that they have subordinated their positions to those held by Hibernia and AHFC and simply request that their liens be ranked by the court in accordance with law.

The Trustee, however, takes the position that none of the parties have or had liens on certain of the Debtor's assets, or alternatively, in the case of Hibernia, that any lien it may have had on the new cars or other assets has been released. The Trustee also asserts various counterclaims and cross claims attempting to avoid certain prepetition transfers allegedly made by the Debtor to AHFC and Hibernia within ninety days of the filing of the petition and certain postpetition payments made to Hibernia.

## I. FACTUAL BACKGROUND

### A. Prepetition History.

American Honda Motor Company ("AHMC") awarded the Debtor a Honda automobile franchise ("Franchise") for the Lake Charles area market in 1990. In May 1991, the Debtor obtained new car floor plan financing from AHFC. AHFC secured its financing with a security agreement and a properly filed UCC–1 financing statement. The Debtor defaulted under its original floor plan with AHFC, resulting in AHFC filing suit against the Debtor in late 1991 or early 1992.

In late 1992, the Debtor entered into a settlement agreement with AHFC ("1992 Settlement Agreement") to repay the unpaid floor plan balance ($559,883.97) in monthly installments, plus interest at a variable rate. Also, in late 1992, the Debtor executed a Wholesale Financing Agreement ("WFA") which granted AHFC a security interest in the following:

All Debtor's personal property now owned or hereafter acquired, including, but not limited to, fixed assets, including all machinery, shop equipment, tools, business and office equipment, furniture, fixtures, supplies, furnishings, all inventory of new and used parts, all proceeds, insurance proceeds, accessories, additions, accessions, and replacements of any of the foregoing, all accounts, accounts receivable, contract rights, chattel paper, documents, instruments, Dealer Reserve Accounts, manufacturer's rebates, service contracts, general intangibles, equipment, goods and inventory, including without limitation, all new and used vehicles, tractors, trailers, semi-trailers, service vehicles and repossessed vehicles, parts and accessories whether held for sale or lease, and all vehicles, parts and accessories of like kinds of types now owned or hereafter acquired from manufacturers, distributors, or sellers by way of replacement, substitution, addition or otherwise, and all rents receivable under lease and rental agreements and any and all leases, for either real or personal property.

AHFC properly filed a second UCC–1 financing statement in connection with the WFA. In consideration of the 1992 Settlement Agreement, the WFA, the 1992 UCC–1 financing statement and other documents, AHFC agreed to provide additional floor plan financing for the Debtor's new car inventory under conditions set forth in the WFA.

In order to facilitate the Debtor's payment obligation under the 1992 Settlement Agreement, Umphrey and Branick loaned the Debtor the sum of $200,000.00. On April 27, 1993, Umphrey and Branick were granted a security interest in certain of the Debtor's assets. They properly perfected their security interest by filing a UCC–1 financing statement on May 14, 1993. As part of the consideration for the 1992 Settlement, however, Umphrey and Branick subordinated the rights of any security interest they held to any security interest held by AHFC.

In the spring of 1995, AHFC agreed to provide floor plan financing for the Debtor's

used cars. Also in the spring of 1995, the Debtor began negotiations with Hibernia for Hibernia to provide floor plan financing for Debtor's used cars. Beginning in July or August 1995, the Debtor began negotiations with Hibernia for Hibernia to provide floor plan financing for the Debtor's new cars.

On September 5, 1995, Hibernia filed a UCC–1 financing statement listing the following property of the Debtor as collateral:

All accounts now owned or hereafter acquired;

All Chattel paper now owned or hereafter acquired, including, but not limited to the reversionary right of grantor and leased goods;

All documents now owned or hereafter acquired, all equipment now owned or hereafter acquired;

All inventory now owned or hereafter acquired, including but not limited to consigned inventory;

All general intangibles now owned or hereafter acquired;

Any and all used vehicles;

All products of collateral are also covered.

Hibernia began advancing funds to the Debtor under the used car floor plan on or about September 14, 1995.

By October 1995, the Debtor had defaulted under the WFA by selling both new and used cars out of trust, i.e., selling vehicles without paying off the floor plan financing. On October 6, 1995, Hibernia sent notice to AHFC of its intention to provide purchase money security financing to the Debtor for its new vehicles. On October 25, 1995, AHFC filed suit against the Debtor in the 14th Judicial District Court, Calcasieu Parish, and obtained a writ of sequestration thereby constructively seizing those movable assets of the Debtor which constituted AHFC's collateral pending the outcome of the lawsuit.

In November 1995, Hibernia approved $2 million for the new car floor plan financing, but required that AHFC execute a subordination. Hibernia sent a proposed subordination agreement to AHFC. On December 11, 1995, AHFC executed a subordination agreement ("Subordination Agreement") in which AHFC subordinated its secured position in favor of Hibernia, but only as to the Debtor's existing, unsold new car inventory and the sale proceeds thereof. In return for the Subordination Agreement, Hibernia agreed to pay AHFC the value of the Debtor's unsold new car inventory still on the Debtor's lot, namely, $1,146,597.30. Hibernia further agreed to pay AHFC the sum of $57,900.00, which was the amount the Debtor had drawn under AHFC's used car floor plan in connection with the six used cars which were still on the Debtor's lot at that time.

On December 15, 1995, AHFC received two checks from Hibernia totaling $1,204,-497.30, thus reducing its claim against the Debtor by that amount. Thereafter, AHFC sent Hibernia the Manufacturer's Statements of Origin ("MSOs") on the existing new car inventory as well as the titles to the six used cars. AHFC kept the MSOs and used car titles for the out-of-trust cars.

Upon receipt of the $1.2 million, AHFC faxed a copy of the executed Subordination Agreement and copies of several UCC–3 statements to Hibernia. AHFC, however, never sent either the original Subordination Agreement or the original UCC–3s to Hibernia. Hibernia did not record the faxed copies of the UCC–3s in the public records.

On February 28, 1996, the Debtor executed a Partial Dation En Paiement ("Partial Dation") in favor of Hibernia, through which the Debtor purported to transfer ownership of the new car inventory to Hibernia in exchange for a partial reduction of debt. The new cars described in the Partial Dation were not physically removed by Hibernia, but remained on the Debtor's sales lot until after the Petition Date.

### B. Postpetition Transactions.

Although the case was filed under chapter 11, the Debtor's intent from the start was to liquidate. Accordingly, and since time appeared to be of the essence, the court entered a Consent Order on April 15, 1996, setting forth certain conditions for the sale of the Debtor's assets, including the Debtor's interest in the Franchise and the new car inventory.

On May 16, 1996, after appropriate notice, the court conducted an auction at which William Navarre ("Navarre") outbid one other bidder and ostensibly acquired the Franchise for $420,000.00. Several other transactions took place following the conversion of the case to chapter 7 on July 15, 1996.

As a result of all transactions, the Trustee now holds the sum of $1,441,235.88, which represents proceeds of the following:

| | |
|---|---|
| $420,000.00 | Sale of Franchise |
| 246,000.00 | Sale of used car inventory |
| 4,200.00 | Sale of 4 lifts and compressor |
| 3,310.70 | Insurance premium rebate |
| 8,000.00 | Sale of office equipment and furniture |
| 759,725.18 | Sale of new car inventory |

On the Petition Date, Hibernia's total claim against the Debtor amounted to $1,821,555.90. Hibernia received $234,909.38 from the Debtor subsequent to the Petition Date. The source of such payments were the sale of new and used cars. Also on the Petition Date, AHFC was due $872,000.00 while Umphrey and Branick were owed $218,333.33.

## II. FUNDS RECEIVED FROM BILLY NAVARRE

### A. In General.

AHFC, Hibernia, and Umphrey and Branick each argue that their lien attaches to the $420,000.00 ("Navarre Funds") as proceeds of the sale of the Franchise. The Trustee argues, however, that the Navarre Funds are property of the estate acquired after the commencement of the case and which are free and clear of all liens or security interests[3]. The Trustee takes the position that the Navarre Funds are not proceeds from the sale of any parties' collateral.

AHFC first claims that the Trustee is barred from raising issues regarding the Navarre Funds based upon the terms of the Consent Order. In the Consent Order, the parties stipulated to certain facts, as follows:

(11) Further, IT IS HEREBY ADJUDGED that debtor owns a franchise from American Honda Motor Co., Inc. ("Motor Company") and that the Motor Company franchise is a valuable asset of the estate. Further, IT IS HEREBY AD-

JUDGED that the Motor Company may terminate the franchise unless it is transferred to another car dealer within a relatively short period of time and thus time is of the essence.

(12) Accordingly, IT IS HEREBY ORDERED that the debtor shall, no later than April 15, 1996, send notice of its intent to sell the Honda franchise to the current highest bidder, giving notice to all creditors, the U.S. Trustee, and William J. Navarre with the minimum selling price of the franchise to be $400,000. The sale will be free and clear of all security interests, liens, encumbrances, privileges, and mortgages for a minimum of $400,000 cash or cash equivalents and to the highest qualified bidder, with all of the sale proceeds being immediately placed into a trust account opened at a depository for bankruptcy accounts and exclusively for the purposes of depositing the proceeds from the sale of the Motor Company franchise and associated good will. If a higher bid is received, a hearing will be held on May 16, 1996 in the United States Bankruptcy Court in Lake Charles, Louisiana at 11:00 a.m. IT IS FURTHER ORDERED that the sale proceeds placed into the Motor Company trust account be subject to all valid, prepetition security interests in the Motor Company franchise and associated good will to the same extent and rank as existed upon the date and time debtor filed for Chapter 11 relief.

The Trustee raises several issues regarding the May 16 auction sale, including (a) whether the Franchise had been terminated prior to the Petition Date, thus leaving the Debtor with nothing to sell, (b) if the Debtor retained the Franchise, whether any transfer thereof could occur without the consent of the franchiser, AHMC, and (c) if the Debtor indeed held the Franchise after the Petition Date, did any party in interest hold a security interest in the Franchise and/or proceeds of the Franchise? These inquiries break down into two general categories. First, did the Debtor retain an interest in the Franchise on and after the Petition Date, and second, does any party in interest hold a

---

3. Section 552.

security interest which covers the Navarre Funds? Whether or not the court may venture into such inquiries, however, depends upon the applicability of the principles of res judicata to the instant case.

## B. Res Judicata.

█ 1. *In General.* Res judicata operates to "bar a subsequent action when a prior action involving the same parties and the same cause of action reached final judgment on the merits in a court of competent jurisdiction." *Agrilectric Power Partners, Ltd. v. General Electric Co.*, 20 F.3d 663, 664–65 (5th Cir.1994). In this circuit, res judicata applies if the following elements are present: (1) identity of the parties, (2) the first order or judgment was rendered by a court of competent jurisdiction, (3) the prior order or judgment is final, and (4) the same issues are raised in both proceedings. *See, e.g., Matter of Super Van, Inc.*, 92 F.3d 366 (5th Cir. 1996).

2. *Court of Competent Jurisdiction/Final Order.* The Trustee does not suggest that either this court was without jurisdiction in entering the Consent Order or that the Consent Order was not final. These requirements are clearly satisfied.

█ 3. *Identity of the Parties.* The Trustee contends that the first requisite element, identity of the parties, is absent, as the Trustee not only was not a party to the Consent Order, he had not even been appointed at that time. This fact, however, is not sufficient in and of itself to deny application of res judicata. In *Eubanks v. F.D.I.C*, 977 F.2d 166 (1992), the question arose as to whether res judicata would apply as to both Dr. and Mrs. Eubanks where the prior order arose in a bankruptcy proceeding involving only Dr. Eubanks and not his spouse. The court said:

It is well-settled that, under certain circumstances, a judgment may bar a subsequent action by a person who was not a party to the original litigation. *See Meza*, 908 F.2d at 1266; *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). For example, where the non-party's interests were adequately represented by a party to the prior action, we have concluded that there is sufficient identity between the parties to apply the principles of res judicata and give preclusive effect to the prior judgment. *Meza*, 908 F.2d at 1266. A non-party, such as Mrs. Eubanks, is adequately represented where a party in the prior suit is so closely aligned to her interests as to be her virtual representative. *Meza*, 908 F.2d at 1267 (citing *Aerojet–General*); see also *Delta Air Lines, Inc. v. McCoy Restaurants, Inc.*, 708 F.2d 582, 587 (11th Cir.1983). This requires more than a showing of parallel interests—it is not enough that the non-party may be interested in the same questions or proving the same facts. *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 864–65 (5th Cir.1985).

In the instant case, the inquiry thus becomes whether the interests of the Debtor, as debtor-in-possession, were sufficiently identical to the interests of the Trustee so as to satisfy the foregoing principles.

In the bankruptcy context, courts have generally recognized that acts of a debtor in possession generally bind a subsequently-appointed trustee, *In re Monument Record Corporation*, 71 B.R. 853, 862 (Bkrtcy. M.D.Tenn.1987), although an exception would exist where there is evidence of fraud or prejudice to the estate. *In re Philadelphia Athletic Club, Inc.*, 17 B.R. 345, 347 (Bkrtcy. E.D.Pa.1982). *See, also, Seidle v. GATX Leasing Corp.*, 45 B.R. 327 (S.D.Fla.1984), where, under principles of equitable estoppel, the court held a subsequent trustee bound by the debtor-in-possession's stipulation.

The duties and responsibilities of a chapter 11 trustee are set forth in section 1106, and, by reference, section 704. With only minor differences, section 1107(a) clothes a debtor in possession with the same duties and responsibilities as a trustee. In commenting upon the similarities of the two with respect to their fiduciary responsibilities, the Fifth Circuit, citing the Supreme Court's decision in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985), said:

The appellees' argument seems premised on the bizarre notion that a debtor-in-possession is under no obligation to act in the best interests of the creditors. The appellees' position "ignores the fact that bankruptcy causes fundamental changes in the nature of corporate relationships." *See Weintraub,* 471 U.S. at 355, 105 S.Ct. at 1994. As the Court noted in *Weintraub:*

> Respondents also ignore that if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. *Wolf v. Weinstein,* 372 U.S. 633, 649–652 [83 S.Ct. 969, 979–981, 10 L.Ed.2d 33] (1963). Indeed, the willingness of courts to leave debtors-in-possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Id.,* at 651 [83 S.Ct. at 980].

471 U.S. at 355, 105 S.Ct. at 1994; *see also In re Hughes,* 704 F.2d at 822 (debtor-in-possession holds its powers in trust for the benefit of creditors; creditors have the right to require the debtor-in-possession to exercise those powers for their benefit); *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 462 n. 8 (6th Cir.1982) ("A trustee in bankruptcy or a debtor-in-possession, as a fiduciary, represents both the secured and unsecured creditors of the debtor."). *Louisiana World Exposition v. Federal Insurance Company,* 858 F.2d 233, 249–50 (5th Cir.1988).

In the instant case, the Consent Order was entered by the court, not necessarily in an effort at compromising certain litigation, but as the culmination of several motions which were pending at the time. Between the Petition Date and the date the Consent Order was entered, numerous motions were filed, including AHFC's motion to convert to chapter 7 or dismiss, AHFC's motion to sequester or prohibit use of cash collateral, and Navarre's motion to convert to chapter 7. These motions were noticed for hearing on April 11, 1996. The matters were taken up in the form of a status conference. All parties in interest had negotiated the settlement of various issues, all of which were incorporated into the Consent Order which was entered of record on April 16, 1996.

Based upon the facts of the case, the court finds that the Debtor did have such an identity of interest with the Trustee so as to hold that this essential element for application of res judicata is present.

4. *Identity of Issues.* In suggesting that the doctrine of res judicata precludes consideration of certain matters, the Trustee actually raises two separate issues. First, what was sold at the May 16 auction, and second, does any party hold a security interest in such property, if any, and the proceeds thereof. For the following reasons, the Court determines that res judicata applies to the former, but not the latter.

#### (a) *What Was Sold?*

Paragraphs 11 and 12 of the Consent Order contain the following language which clearly indicates the Debtor's present ownership of the Franchise:

- "... debtor owns a franchise from American Honda Motor Co. Inc. ('Motor Company') ..."

- "... the Motor Company franchise is a valuable asset of the estate...."

- "... the Motor Company may terminate the franchise unless it is transferred to another car dealer within a relatively short period of time and thus time is of the essence."

- "... the debtor shall ... send notice of its intent to sell the Honda franchise ..."

The issue of what was to be sold at the May 16 auction was clearly determined in the Consent Order. There is no question that there is an identity of issues with regard to what property was sold at the May 16 auction. Thus, the issues raised by the Trustee with regard to whether the Debtor indeed held the Franchise at the time it was purportedly sold or whether in fact it could be sold will not be addressed by the court, as res judicata precludes inquiry into such matters at this time.

### (b) *Liens?*

■ On the other hand, the issue of liens against the Franchise and the proceeds thereof was clearly not addressed in the Consent Order. In fact, the issue of the validity of liens was expressly reserved for later proceedings, as paragraph 12 of the Consent Order provides that the proceeds from the sale of the Franchise would be placed in a trust account and would—

> be subject to all valid, prepetition security interests in the Motor Company franchise and associated good will to the same extent and rank as existed upon the date and time debtor filed for Chapter 11 relief.

And, for good measure, paragraph 22 of the Consent Order provides that—

> this Consent Order does not, in and of itself, create any additional security interests or otherwise affect the ranking of the security of any creditor.

There is obviously a lack of identity of issues between the Consent Order and the question of the extent, validity, and rank of security interests in the Navarre Funds. The court must examine issues raised by the Trustee in connection with such alleged interests, as res judicata simply does not apply to this issue.

The issues raised by the Trustee focus almost exclusively on whether the $420,-000.00 was derived from the sale of the Franchise. As the court has already held that res judicata principles apply to the issue of what was sold at the May 16 auction, those issues have been determined and are not to be revisited. Thus, the only issue is whether AHFC, Hibernia, or Umphrey and Branick hold a lien on the Navarre Funds, and who among those holding such liens is entitled to priority.

■ As the Consent Order provided that the funds derived from the auction would be subject to all valid, prepetition security interests in the franchise, the issue is whether AHFC, Hibernia or Umphrey and Branick held valid, pre-petition security interests in the Franchise and the rank of any such security interests. Each such party held a lien on general intangibles, which is defined as "any intangible personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, investment property, and money." LSA–R.S. 10:9–106 [4]. Although there are no Louisiana cases on point, case law from other jurisdictions uniformly holds that franchise agreements and licenses fall within the definition of "general intangibles." *See, e.g., In re Scheidmantel Olds–Cadillac, Inc.,* 144 B.R. 296 (Bkrtcy.W.D.Pa.1992); *In re Topsy's Shoppes, Inc.,* 131 B.R. 886, 888 (D.Kan. 1991); *In re Hengalo Enterprises, Inc.,* 51 B.R. 54 (Bankr.S.D.Fla.1985). Therefore, AHFC, Hibernia and Umphrey and Branick each hold liens on the Navarre Funds. In accordance with § 9–312(5)(a), security interests are to be ranked according to date of recordation, unless a special priority rule applies. As no such special priority rule applies in the instant case, and taking into account the Umphrey and Branick subordination, the court therefore concludes that AHFC holds a first ranking security interest in the Navarre Funds, followed by Hibernia and Umphrey and Branick in that order.

### III. TRUSTEE'S AVOIDABLE PREFERENCE CLAIM AGAINST AHFC

The Trustee claims that certain payments to AHFC constitute preferential transfers which the Trustee may avoid pursuant to the provisions of section 547(b). That section provides:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—

---

**4.** Chapter 9 of Title 10 of the Louisiana Revised Statutes is the Louisiana equivalent of Chapter 9 of the Uniform Commercial Code. Further references to LSA–R.S. 10:9 herein shall be shown as " § 9–_____."

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The transfers which the Trustee asserts are avoidable under section 547(b) fall into two categories, namely, the $1.2 million paid by Hibernia to AHFC in December 1995, and certain other payments from the Debtor to AHFC between December 12, 1995 and February 6, 1996.

## A. The $1.2 Million.

AHFC received $1.2 million from Hibernia in on or about December 15, 1995, a point in time clearly within 90 days of the Petition Date. AHFC, however, argues that (1) the money was not property of the estate under the so-called "earmarking" doctrine; (2) the debtor was not insolvent at the time of the transfer; (3) AHFC did not receive more than they would receive in a chapter 7 liquidation; and (4) in the event an avoidable preference did occur (which AHFC denies), the defenses available to defendants pursuant to sections 547(c)(1), 547(c)(5), and/or 547(c)(6) operate to defeat the action.

■■■■ No action lies under section 547(b) unless the Debtor had an interest in the property which was the subject of the contested transfer. The earmarking doctrine focuses on this issue:

The crux of the preference statute as it relates to the "earmarking doctrine" is that only a "transfer of an interest of the debtor in property" may be avoided.

*In re EUA Power Corporation,* 147 B.R. 634, 639 (Bkrtcy.D.N.H.1992).

The *EUA* court went on to say:

The "earmarking doctrine" is a judicial interpretation of whether certain transactions constitute a "transfer of an interest of the debtor in property." The "earmarking doctrine" basically provides that if property transferred in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be considered a preference. The doctrine derives from the concept that co-obligors on a loan can set aside, or "earmark", payments which, although they pass through the debtor's estate, are designated for payment of a pre-petition creditor that could proceed against the non-debtor co-obligor. The money or property was never subject to an equitable interest of the debtor and, accordingly, such assets are not considered truly property of the estate within the meaning of section 541 of the Bankruptcy Code. Therefore they are not subject to a preferential attack under section 547(b) of the Bankruptcy Code.

147 B.R. at 640.

The court in *EUA* favorably cited the Fifth Circuit's earlier decision of *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351 (5th Cir.1986). The *Coral Petroleum* court observed:

For a preference to be voided under section 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *Genova v. Rivera Funeral Home (In re Castillo),* 39 B.R. 45, 46 (Bankr. D.Colo.1984); *see also Young v. Scandore Paper Box Corp. (In re Lucasa International, Ltd.),* 13 B.R. 596 (Bankr.S.D.N.Y. 1981); *In re Moskowitz,* 13 B.R. 357 (Bankr.S.D.N.Y.1981). If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed. This type of transaction is referred to as "earmarking," and is, according to a noted bankruptcy

treatise, applicable in the following circumstances:

> "In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly 'earmarked.'" 4 *Collier on Bankruptcy* ¶ 547.25 at 547–(101–102) (15th ed.1986).

The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate. (Citations omitted.)

797 F.2d at 1355–1356.

The key issue in *Coral Petroleum* was whether the debtor had any control over the funds. The Fifth Circuit determined that although the funds were technically transferred to the debtor and then to the original creditor, there was actually only a bookkeeping entry and the debtor never actually had control over the funds.

In the instant case, the evidence indicates that the Debtor likewise never had any control over the $1.2 million. These funds were transmitted directly from Hibernia to AHFC and never came under the Debtor's control. Additionally, Paul Van Geffen, a representative of Hibernia testified that the Debtor could not have received the funds under any circumstances. He testified that if the negotiations with AHFC had fallen through, the Debtor would not have received the $1.2 million; Hibernia simply would not have made the loan. Mr. Van Geffen further testified that Hibernia would only have sent the funds to AHFC, and not to the Debtor.

The Trustee asserts that the earmarking doctrine should not apply in the present case because this is not a situation where one creditor was merely substituted for another. He contends that because Hibernia received a security interest and AHFC did not release any portion of its security interest, the doctrine of earmarking should not be applicable.

The court does not find this argument persuasive. Once the $1.2 million was paid to AHFC, the Debtor's obligation to AHFC was reduced by this amount, thus reducing AHFC's secured claim. At that same point the secured claim of Hibernia increased by $1.2 million. While each creditor may have had a security interest over the entirety of the Debtor's property, the amount either could realize based upon such security interest was of course limited to the amount of the debt owed by the Debtor. As long as the debt owed to AHFC was decreased, it is irrelevant that AHFC did not release any portion of its security interest. The Debtor's estate was not diminished by the transfer.

The court therefore finds that the transfer of the $1.2 million from Hibernia to AHFC was not a "transfer of an interest of the debtor in property" within the meaning of section 547(b), and, accordingly the Trustee's attempt to avoid such transfer must fail.

## B. ADDITIONAL PAYMENTS TO AHFC.

In the 90 days preceding the Petition Date, AHFC also received 10 payments from the Debtor, as follows:

| Date | Amount of Payment |
| --- | --- |
| December 12, 1995 | $22,427.00 |
| December 13, 1995 | $18,969.49 |
| December 21, 1995 | $13,608.40 |
| January 2, 1996 | $20,085.00 |
| January 8, 1996 | $17,690.80 |
| January 10, 1996 | $13,084.00 |
| January 12, 1996 | $21,856.16 |
| January 16, 1996 | $20,085.00 |
| February 1, 1996 | $ 1,597.26 |
| February 6, 1996 | $ 2,669.40 |

The payment made on December 21, 1995, in the amount of $13,608.40 was a payment pursuant to the 1992 Settlement Agreement. The remaining payments were apparently from the sale of vehicles and/or parts. Although AHFC originally claimed that these remaining payments were derived from the sale of AHFC's collateral, *i.e.,* vehicles sold

prior to the execution of the Subordination Agreement, AHFC now concedes that the payment of $21,856.16 on January 12, 1996, was on account of the sale of Hibernia's collateral. As to the remainder, however, AHFC continues to argue that such payments were derived from the sale of AHFC's collateral. The Trustee claims, however, that the funds were derived from the sale of Hibernia's rather than AHFC's collateral.

1. *$13,608.40 Payment (December 21, 1995).*

AHFC does not seriously dispute that all elements of section 547(b) have been satisfied with respect to this payment. The court finds that the Trustee has indeed satisfied his burden with respect to such elements.

■ However, as such payment was the Debtor's normal monthly payment to AHFC under the 1992 Settlement Agreement, AHFC argues that these payments were made in the ordinary course of the Debtor's business and are therefore subject to the affirmative defense found at section 547(c)(2). That section provides:

(c) The trustee may not avoid under this section a transfer—

\* \* \* \* \* \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; . . . .

In the case of *In re Bourgeois,* 58 B.R. 657, 659 (Bkrtcy.W.D.La.1986), Judge Bernard observed:

The legislative history of section 547(c)(2) states that "[t]he purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's

slide into bankruptcy." House Report 95–595, 95th Congress, 1st Session (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6329. Thus, payments made by a debtor to employees, suppliers, for utilities and rent, and other similar operating expenses or trade credit transactions, were intended by Congress to be exempt from recovery as preferences. [Citations omitted.]

Courts have on several occasions held that transfers made in connection with settlement of litigation do not fall within the "ordinary course of business" defense of section 547(c)(2). *See, e.g., Hickey v. Nightingale Roofing, Inc.,* 83 B.R. 180 (D.Mass.1988), and *In re Industrial & Municipal Engineering, Inc.,* 127 B.R. 848 (Bkrtcy.C.D.Ill.1990). In fact, the court in the *Hickey* case adopted a *per se* rule regarding payments made in connection with settlement of litigation, declaring:

Thus, it appears appropriate to enforce a per se rule that litigation settlements are not to be treated under any circumstances as transfers either "in the ordinary course of business" or "according to ordinary business terms."

Based upon the foregoing discussion, this court concludes that the payment by the Debtor to AHFC on December 21, 1995, in the amount of $13,608.40, is not protected by the provisions of section 547(c)(2).

2. *$21,856.16 Payment (January 12, 1996).*

■ In defense of the preference action with respect to this transfer, as well as the remaining 8 payments, discussed in paragraph 3, *infra,* AHFC contends that the Trustee has not met the requisite burden of proof with respect to the evidentiary requirements of section 547(b)(5). The court agrees with AHFC's position that section 547(b)(5) will protect the transferee where the transferee is fully secured:

Generally, payments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation.

5 *Collier on Bankruptcy*, ¶ 547.03[7], p. 547–41 (15th Ed. Rev.).

Based upon the evidence adduced, however, the court concludes that AHFC was not a fully secured creditor with respect to the vehicle which the Debtor sold in order to generate the $21,856.16 paid to AHFC on January 12, 1996.

In attempting to identify the source of the funds represented by the 10 contested transfers, AHFC was able to identify the funds received by the vehicle identification number ("VIN") on each such vehicle sold. This investigation revealed the date each such vehicle was actually sold. Robert Hurt, AHFC's national credit manager, acknowledged in his testimony that, based upon such investigation, the vehicle which generated these proceeds ($21,856.16) was sold *subsequent* to the effective date of the Subordination Agreement. At that time, however, Hibernia's security interest with respect to such sold vehicle outranked that of AHFC. Consequently, AHFC did not enjoy a senior secured position with respect to such vehicle, nor to the proceeds resulting from the sale thereof, and, accordingly, was not fully secured with respect to that transfer.

As with the $13,608.40 payment made on December 21, 1995, AHFC does not seriously dispute that the remaining elements of section 547(b) have been satisfied with respect to this transfer. The court finds that the Trustee has indeed satisfied his burden with respect to such elements. Further, the court finds that no defense exists under section 547(c) which would insulate AHFC from the preference action.

### 3. *Remaining 8 Payments.*

As pointed out in paragraph 2, *supra*, if the funds received by AHFC were derived from the sale of collateral on which AHFC held a first ranking security interest, the transfer could not be avoided as preferential because the provisions of section 547(b)(5) would not have been satisfied, *i.e.*, AHFC had not received more than it would have received in a chapter 7 liquidation. However, if the funds received by AHFC were derived from the sale of collateral on which another entity, *i.e.*, Hibernia, held a first ranking security interest, the requirement of section 547(b)(5) would be deemed satisfied.

Thus, the inquiry is whether AHFC held a senior perfected security interest in the vehicles which were sold by the Debtor in order to generate the funds paid to AHFC. Mr. Hurt testified that AHFC's review of the VINs of the cars sold indicated that, with the exception of the $13,608.40 payment made on December 21, 1995, the sales proceeds represented vehicles sold *prior* to the Subordination Agreement. At such times, AHFC did hold a senior security interest in such vehicles. The Trustee presented no evidence to contradict this testimony. Accordingly, the remaining 8 payments received by AHFC from the sale of vehicles were not preferential transfers in that the requirements of section 547(b)(5) have not been satisfied.

## IV. EQUITABLE SUBORDINATION

The Trustee takes the position that the priority of AHFC's entire claim should placed below the claims of other creditors pursuant to principles of equitable subordination. This claim, which arises under section 510(c), is based upon the following: (1) AHFC defrauded Hibernia in receiving the $1.2 million and not forwarding the original Subordination Agreement; (2) AHFC judicially seized the used car inventory of the Debtor in an attempt to put the Debtor out of business to the detriment of the other creditors; and (3) AHFC received funds which it knew or should have know was proceeds from the sale of Hibernia's collateral.

Section 510(c) provides:

... after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

■ The seminal Fifth Circuit case involving section 510(c), *In re United States Abatement Corporation,* 39 F.3d 556 (5th Cir.1994), set forth the requirements for equitable subordination to apply:

This court has established a three-prong test to identify those situations in which equitable subordination is permitted: (1) the claimant must have engaged in some type of inequitable conduct; (2) the conduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. *In Re Fabricators, Inc.,* 926 F.2d at 1464–65; *Smith v. Associates Commercial Corp. (In re Clark Pipe & Supply Co.),* 893 F.2d 693, 699 (5th Cir.1990); *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir.1977).

39 F.3d at 561.

■ The court then observed those limited areas where equitable subordination has generally been applied:

While our three-pronged test appears to be quite broad, we have largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors. *Holt v. FDIC (In re CTS Truss, Inc.),* 868 F.2d 146, 148–49 (5th Cir.1989) (citing cases).

*Ibid.*

With these principles in mind, the court must consider whether AHFC's conduct of which the Trustee complains fits within any of the "general paradigms" described by the court.

■ The Trustee first contends that AHFC defrauded Hibernia when, after receiving $1.2 million from Hibernia, it failed to return the original Subordination Agreement and UCC–3's. While the evidence supports this factual finding, the court does not believe that AHFC defrauded Hibernia. Hibernia sought a Subordination Agreement from AHFC in exchange for the payment of $1.2 million. Upon the payment, Hibernia got exactly what they bargained for. Hibernia received the MSOs and titles with regard to the vehicles which were subordinated. AHFC does not dispute that it subordinated its position to Hibernia. Hibernia was not harmed by the failure of AHFC to send the original documents or by the lack of filing of the UCC–3's. The only consequence of the recordation of the UCC–3's would have been with respect to the Subordination Agreement's effect as to third parties. In the present case, the dispute as to ranking is between AHFC and Hibernia, not a third party. Therefore, the court finds that Hibernia was not harmed by AHFC's act. Hibernia bargained for the subordination by AHFC and received such subordination. For that reason, the court finds that AHFC did not defraud Hibernia.

■ The Trustee next suggests that AHFC's judicial seizure and receipt of funds from the sale of its collateral constitutes conduct sufficient to trigger equitable subordination. The court disagrees.

The seizure of the Debtor's property was merely an exercise of AHFC's rights as a creditor. This appears to be no more than an attempt on the part of AHFC to collect a just debt based upon rights granted by the Debtor in the security agreement. And the Trustee points to no other evidence to suggest that the seizure was anything more than just that. The court does not believe that a secured creditor is obligated to forestall collection efforts to protect the interest of other creditors.

The court also believes that the receipt of funds from the sale of vehicles was but an exercise of AHFC's rights as a creditor. AHFC was entitled to receive payments from the Debtor, and the receipt of such funds is not the type of activity which supports a claim of equitable subordination.

While the language of *United States Abatement* does not suggest that the "general paradigms" outlined therein are exclusive and describe the only situations where equitable subordination may be applied, the Trustee has not presented any compelling

reason which suggests an extension of section 510(c) to the acts of AHFC in the instant case. For these reasons, the court finds that the claim of AHFC should not be equitably subordinated pursuant to section 510(c).

## V. HIBERNIA'S LIEN AS A RESULT OF THE PARTIAL DATION

Both AHFC and the Trustee contend that, upon the execution of the Partial Dation, Hibernia acquired ownership of the vehicles and, through confusion[5], thereby lost any security interest it had in such vehicles. Hibernia, on the other hand, argues that the Partial Dation was not completed because they received no consideration for the transaction.

■ The court finds that the Partial Dation was in fact completed. Pursuant to the Partial Dation, in exchange for a reduction of the debt owed by the Debtor, Hibernia received ownership of the vehicles. Thus, the consideration to Hibernia was the acquisition of ownership of the vehicles, which it received. Although Hibernia intended to subsequently execute a repurchase agreement with American Honda Motor Company ("AHMC"), the failure to execute that agreement does not affect the validity of the Partial Dation, i.e, the execution of the repurchase agreement was not a condition precedent to the Partial Dation becoming effective. The court finds that the Partial Dation was completed when executed by the parties thereto, thereby transferring ownership of the vehicles to Hibernia as of February 28, 1996. Consequently, pursuant to Civil Code Articles 1903 and 3319, Hibernia's security interest in the vehicles was extinguished when Hibernia acquired ownership of those vehicles.

■ The Trustee's next argument is that the Partial Dation was never perfected as to third parties and thus may be avoided pursuant to section 544(b). The Trustee then suggests that pursuant to section 551, the transfer should be preserved for the benefit of the estate.

The Trustee's claim that the Partial Dation was not perfected as to third parties is based upon the fact that Hibernia never acquired actual physical possession of the new car inventory. Delivery is essential under Louisiana law to perfect a transfer of movable property. CC Art. 518. In turn, CC Art. 2477 provides the methods of making delivery—

Delivery of a movable takes place by handing it over to the buyer. *If the parties so intend delivery may take place in another manner,* such as by the seller's handing over to the buyer the key to the place where the thing is stored, or by negotiating to him a document of title to the thing, or even by the mere consent of the parties if the thing sold cannot be transported at the time of the sale or if the buyer already has the thing at that time. (Emphasis added.)

At the time of the Partial Dation, Hibernia already held title (or actually the MSOs which equate to titles in newly manufactured cars) to the Debtor's new vehicles. The vehicles remained on the Debtor's lot following the Partial Dation and continued to be sold by the Debtor with Hibernia's consent.

Mr. Van Geffen testified that Hibernia intended to acquire ownership of the vehicles upon the execution of the Partial Dation and that the parties had agreed that the vehicles would remain on the Debtor's lot. The parties further agreed that Russ Williams, an employee of the Debtor, would look after the vehicles on behalf of Hibernia and could continue to sell the vehicles until they could be inspected by AHMC.

As stated hereinabove, the transfer of the vehicles from the Debtor to Hibernia occurred upon the execution of the Partial Dation. Such transfer was also perfected as to third parties upon execution of the Partial Dation. While the vehicles were not physically removed from the Debtor's lot, the court believes that pursuant to CC Art. 2477, the parties intended delivery to take place "in another manner", i.e., upon the execution

5. See Articles 1903 and 3319, Louisiana Civil Code. References to the Louisiana Civil Code herein shall be shown as "CC Art. ____."

of the Partial Dation. As Hibernia already held indicia of title to the vehicles, *i.e.*, the MSOs, the transfer was fully perfected as to third parties upon execution of the Partial Dation. Once the parties agreed to the transfer, Hibernia held the MSOs no longer as a secured creditor, but as owner.

The Partial Dation accomplished two results: (1) the debt to Hibernia was reduced by the amount intended by the parties, *i.e.*, the amounts received from the sale of the vehicles, pursuant to CC Art. 2657; and (2) Hibernia acquired ownership of the vehicles thereby extinguishing its security interest in the new car inventory by confusion pursuant to CC Arts.1903 and 3319.

As a result of the foregoing, Hibernia is the owner of the funds resulting from the sale of the collateral. Are these funds, however, subject to any valid liens? The answer to this inquiry is "Yes" as both AHFC and Umphrey and Branick hold security interests in the proceeds. These parties, therefore, are entitled to payment from those proceeds with respect to their secured claims in preference to Hibernia, whose lien was extinguished.

## VI. PAYMENTS MADE TO HIBERNIA AFTER PARTIAL DATION

Following the execution of the Partial Dation, the Debtor continued to send proceeds from the sale of the new car inventory to Hibernia. These payments totaled $365,106.95. Two issues are raised by these payments. First, the Trustee asserts that these payments are avoidable as preferential transfers. Second, AHFC asserts a claim against Hibernia based upon Hibernia's receipt of such funds.

### A. Preferential Transfer.

■ Again, for the Trustee to succeed in this action under section 547(b), the Debtor must have had an interest in the property which was the subject of the transfer. In this instance, however, the transfers were of proceeds from the sale of vehicles which Hibernia acquired as a result of the Partial Dation. Consequently, as the transfers were not transfers of an interest of the Debtor in

property, the threshold requirement of section 547(b) has not been met.

### B. AHFC's Rights Against Hibernia.

■ The court has held that Hibernia acquired ownership of the vehicles as a result of the Partial Dation. However, the lien of AHFC remained in place. As a result, Hibernia held an ownership interest in the proceeds, but AHFC held a lien on such proceeds. As a general tenet of security devices law, a secured party is entitled to receive proceeds in preference to the owner of the property. Thus, Hibernia received proceeds which rightly should have been paid to AHFC. For that reason, AHFC is entitled to receive from Hibernia, the funds paid by the Debtor which represented proceeds of the sale of new cars following the Partial Dation.

## VII. LIENS ON USED CARS

In May 1991 and again in November 1992, AHFC filed UCC–1 financing statements in order to perfect its security interest in the Debtor's used car inventory. In May 1993 and September 1995, Umphrey and Branick and Hibernia, respectively, filed similar UCC–1 financing statements. Umphrey and Branick, however, subordinated their position to both AHFC and Hibernia.

■ Unless a special priority rule applies, § 9–312(5)(a) requires that competing security interests rank according to the time of filing. Thus, unless Hibernia is entitled to a special priority, AHFC's lien outranks that of Hibernia as to the used car inventory. Hibernia, however, claims such special priority as the holder of a purchase money security interest.

Pursuant to § 9–312(3), a purchase money security interest in inventory has priority over competing security interests in the same inventory if three conditions are met. Specifically, the party claiming the purchase money security interest must (1) file proper notice before the inventory is delivered to the debtor, (2) give written notice to all secured parties who have previously filed that he has or expects to acquire a purchase money security interest in inventory of the debtor, and (3) insure that such notice is actually re-

ceived by the other secured parties before the debtor obtains possession of the inventory.

In order to benefit from the provisions of § 9–312(3), a party must first establish that it holds a purchase money security interest, which is defined as (1) a security interest taken or retained by a seller to secure the price of collateral, or (2) a security interest taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or use of the collateral if that value is in fact so used. § 9–107.

Mr. Van Geffen, testified that on September 14, 1995, Hibernia began to allow the Debtor to draw on its used car account. He further testified regarding Hibernia's procedure for providing floor plan financing for used cars. First, after acquiring a used car from a customer on a trade-in or otherwise, the Debtor would prepare a used car worksheet, thus establishing the value of the used car. Second, the Debtor delivered the worksheet and car title to Hibernia. Third, Hibernia would loan the Debtor 80% of the value of the used car by placing the proceeds into the Debtor's general operating account.

The court finds that Hibernia does not hold a purchase money security interest in the used cars. The loan did not allow the Debtor to acquire rights in the used cars. Based upon Mr. Van Geffen's testimony, the Debtor acquired rights in the used vehicles *prior* to receiving the loan from Hibernia. Additionally, the court notes that while Hibernia did give written notice of its intent to acquire a purchase money security interest in inventory to the other secured creditors, the notice was given in October, 1995, which was *after* the Debtor began to receive loan proceeds. Thus, Hibernia did not precisely follow the requirements of either 9–107 to hold a purchase money security interest or § 9–312(3) to hold a priority over other security interests.

For the foregoing reasons, the residual rule of § 9–312(5)(a) applies and the security interest in the used car inventory must be ranked based upon the date of filing of such interests. Accordingly, the court concludes that AHFC holds a first ranking security interest over the used car proceeds, followed by Hibernia and Umphrey and Branick, respectively.

## VIII. HIBERNIA'S CLAIMS AGAINST AHFC

Hibernia asserts four causes of action against AHFC, namely (1) breach of contract, (2) error, (3) detrimental reliance, and (4) misrepresentation.

■ With respect to the first three causes of action, Hibernia essentially seeks relief against AHFC because AHFC failed to mail the original Subordination Agreement and UCC–3 notices to Hibernia. However, as the court previously discussed, Hibernia got exactly what it bargained for and was not harmed by the failure of AHFC to mail the original documents. Hibernia would have been in the same position vis-a-vis AHFC had the original documents been sent. Prior to the Partial Dation, and based upon the Subordination Agreement, Hibernia held a first ranking lien as to the new car inventory. Hibernia was injured by its own decision to execute the Partial Dation, not by any action or inaction by AHFC.

■ As to the fourth claim against AHFC, Hibernia alleges that AHFC concealed the Debtor's financial situation from Hibernia. Hibernia claims that had it known of the Debtor's true financial condition, Hibernia would not have agreed to provide financing to the Debtor nor pay AHFC $1.2 million. These allegations, however, are not borne out by the evidence.

The testimony of Mr. Van Geffen clearly demonstrates that Hibernia was fully aware of the Debtor's financial condition at the time Hibernia decided to make the loan to the Debtor. Mr. Van Geffen testified that he had road the lawsuit filed by AHFC against the Debtor which fully set forth the Debtor's out-of-trust position. Mr. Van Geffen also testified that he had examined the Debtor's bank statements. Additionally, Judy Taylor, the Hibernia employee who analyzed the Debtor's used car loan application, testified that she was not aware of any information from AHFC and did not rely upon any information from AHFC in making her recom-

mendation that the used car loan to the Debtor be approved.

The court believes that Hibernia made the decision to loan money to the Debtor based upon its own analysis, and not as a result of any information provided by AHFC. Additionally, the court is unaware of any principal of law which would have imposed a duty upon AHFC to assist Hibernia in making lending decisions. There were no allegations of fraud, collusion, or the like, only a claim of a failure to disclose. This is not actionable.

For the foregoing reasons, the court holds that AHFC is not liable to Hibernia under any of Hibernia's counterclaims.

## IX. CONCLUSION

In conclusion, the court makes the following findings:

(1) AHFC, Hibernia and Umphrey and Branick, in that order of ranking and priority, hold valid and perfected security interests in the Navarre Funds;

(2) AHFC, Hibernia and Umphrey and Branick, in that order of ranking and priority, hold valid and perfected security interests in the used car inventory and the proceeds thereof;

(3) Hibernia holds an ownership interest in the new car proceeds;

(4) AHFC and Umphrey and Branick, in that order of ranking and priority, hold valid and perfected security interests in the new car inventory and the proceeds thereof;

(5) As to all other property of the Debtor, the secured parties hold security interest as set forth in their respective security interest, to be ranked according to date of filing;

(6) The transfer of $1.2 million to AHFC by Hibernia may not be avoided as a preference under section 547(b) as the Debtor had no interest in such property;

(7) With the exception of the payment of $21,856.16, payments received by AHFC from the Debtor on account of the sale of vehicles between December 12, 1995 and February 6, 1996, may not be avoided as a preference under section 547(b) as the requirements of section 547(b)(5) have not been met;

(8) The transfer of $21,856.16 by the Debtor to AHFC on January 12, 1996, is avoidable as a preference in accordance with section 547(b);

(9) The transfer of $13,608.40 by the Debtor to AHFC on December 21, 1995, on account of the 1992 Settlement Agreement, is avoidable as a preference in accordance with section 547(b);

(10) The payments made by the Debtor to Hibernia following the execution of the Partial Dation are not avoidable as preferences under section 547(b) as such did not constitute transfers of an interest of the Debtor in property;

(11) Hibernia is liable to AHFC for payments made by the Debtor to Hibernia following the Partial Dation, in the sum of $365,106.95;

(12) AHFC is not liable to Hibernia under Hibernia's counterclaims; and

(13) The Trustee's demand to equitably subordinate AHFC's claim to the claims of other creditors is without merit.

Within 10 days of the entry of these reasons, counsel for AHFC shall (a) prepare a proposed order in conformity with the foregoing reasons, (b) serve a copy of such proposed order on counsel for the Trustee, Hibernia, and Umphrey and Branick, and (c) forward such proposed order (together with a 3½ inch computer disk formatted for WordPerfect 6.02 or higher) to the Clerk of the Bankruptcy Court for filing. Counsel for the other parties shall have 5 days within which to advise the court in writing of any objections to the form of the proposed order, after which the court will enter an appropriate order.